Good morning. Good morning, Your Honors. My name is Hannah Stone. I represent Plaintiff Stacy Kiser. If I may reserve two minutes. Thank you. Your Honors, this is not a case about a landlord unaware of danger. It is about the federal government, which adopted strict rules to protect people from dangerous dogs on its animals, and then chose to ignore them. That failure led to a brutal attack. The district court excused the government's inactions under Montana law. But where the federal government owns the property, creates safety rules, and then fails to follow them, it cannot escape responsibility, either under Montana law or the Federal Tort Claims Act. By way of background, this case stems from a brutal dog attack that occurred on November 7th, 2019. Plaintiff Catherine Stacy Kiser was out on a walk along a public road. A pit bull owned by a defendant — I think we know the facts, we're familiar with those. As I understand it from the briefs and the district court decision, it seems that you have sort of two types of arguments. One is that Mr. Jackson, who owned the dog, was himself negligent, and that the government is vicariously liable through him. Another is that there was essentially negligence as a landlord. Maybe to start with the second one, because the district court, which addressed this one in a little more detail, said there hasn't been a showing that the government was new of or consented to Mr. Jackson, the tenant, having a vicious dog in the house. So why was that wrong? Thank you, Your Honor. And we did have four issues, and you highlighted two of them, which is respondeat superior and the second, premises liability, which I'm happy to address. Yes, you are correct. The district court did conclude that the government could not be held responsible under premises liability as a landlord, but it is our position that because the BIA contained a housing policy which expressly warned that tenants in government-owned housing could not possess not only vicious animals but specifically pit bulls. How does that show they knew he had the dog? Correct. And so, Your Honor, that goes back to going back to Montana law under premises liability, and it's the two-part test under the restatement second of torts 379A. The lessor at the time of the lease consented to such activity or knew that it would be carried on. Again, the government knew that tenants may possess animals as expressed in their own written policies, but with respect to the owning of a pit bull, Montana law and the reason to know that it would unavoidably involve such an unreasonable risk or that special precautions necessary to safety would not be taken, here the government acknowledges that pit bull dogs create an unavoidable risk, a safety issue, which is why they prohibited them in the housing. I mean, everybody knows. I think everybody would know that at some level. I just don't see how this really resolves the issue on this side of the case in terms of why the government knew or consented to Mr. Jackson having this vicious dog in his house. It doesn't seem that maybe they might have known he had a dog. It's not apparent that the government knew it was a dangerous dog. And that, again, goes back to premises liability and what a landlord is responsible for with respect to their tenants. And I believe that under Limberhand, which is a Montana case, a landowner has a duty to inspect their property and warn of dangerous conditions. Again, that's a duty imposed under Montana law. Here the evidence, and this was a determination on summary judgment, but the evidence of record notes that the government did not inspect the government housing provided to Mr. Jackson, which was directly contradictory to their own written policies. It was also contradictory to Mr. Jackson's prior tenancy years earlier in government owned housing where annual reviews were conducted. Let's go to the respondent superior piece of this. Before you leave that, let me just ask a hypothetical to see how far your argument goes. Let's assume it's out of the BIA context and it's a BLM lease of a cabin, which occurs in Montana, as you know, and with similar restrictions. Would your argument still apply for a pit bull that occurred on that property? Thank you, Justice Thomas. I believe it would, again, look at what the terms of the lease were in your hypothetical situation. If the landowner, in that case the BLM, believed that certain conduct created an unreasonable risk of harms to potential occupants, trespassers, and forbid that type of activity from taking place on government housing vis-a-vis a lease, then yes, I think that it does extend to the owner of the land under the hypothetical, the BLM, to exercise that control and also to prohibit that activity. Does that answer your question?  Thank you. Go ahead. Let me ask you this before my colleague goes forward. To me, the LUTs or LUTs, however you want to say it, case is a big deal on your side. As you know, the government claims that that case is distinguishable. You I gather do not. Why does this case apply and help you? Why is the government wrong that it is distinguishable? Thank you, Justice Smith. Yes, LUTs. I will go with LUTs if that is all right with you.   Yes. So it's our position. So in making its decision, the district court relied on LUTs and specifically carved out the exception because it was military housing, and it does intermix with the respondeat superior argument as Justice Brett raised. But I think that LUTs is helpful to Kaiser because, again, we have factors which, if applied consistently to the Jackson tenancy, parallel with this factual scenario. In the lower court's decision, he carved out that exception because he said because it was military and the service member was always in the, quote, line of duty, that was not applicable. However, when you actually review the finding in LUTs and looked at the factors that are analyzed, there are three factors that I think are parallel. Those are that, number one, the federal employee lives in federally provided housing, consistent with the facts as we have here. In LUTs, we also have that the federal employee is obligated to maintain that federally provided housing by complying with certain rules or regulations. That's where the district court drew a distinction from military housing as opposed to what happened in the Jackson situation, but we disagree with that. In LUTs, there was a base regulation which pertained to the control of animals. Here, the BIA housing handbook, as I've already noted and as is bold and highlighted in our briefing, has that specific regulation which includes regulations and requirements for not only controlling animals but also prohibits pit bulls. The third factor in LUTs that I think is, again, supportive of Kaiser's position, which was not considered by the district court, was that the federal employee is subject to discipline if they failed to follow those policies. In LUTs, because it was a military employee, he was subject to military, quote, discipline. Here, however, Jackson, as a federal employee, was also subject to discipline when he maintained the pit bull. He was evicted from his housing specifically by the government because they did not provide a reason, but it was because he was sued under the Federal Tort Claims Act, so he was subject to discipline, evicted from his housing, and had to go find new housing where he had to pay rent. So it would be our position, Justice Smith, that LUTs is helpful and not appropriately applied by the district court. Does this, in your view, turn on the circumstances by which Jackson was living in the house? Because here he was living in the house for free. There's record evidence that indicates that he was doing so on the understanding that he would be improving the house or maintaining it, preventing it from falling into disrepair, or it sounds like it was already in some degree of disrepair and he was making it better. Are those facts relevant, or would you be prevailing even without those facts? I think that those are relevant when you examine how Jackson came to reside in the housing. He was allowed to live there because he was a government employee. It was government-provided housing and did so in exchange for the upkeep of the property. So I do think that that does play into both the premises. What if he just was living there and paying rent? Would this be the same case from a respondent superior standpoint? In what sense would the dog be incidental to the scope of his employment if he was just living there? So I'm going to take away premises liability and follow your direction on respondent superior. Yes, correct. I think that with respect to respondent superior, the fact that he was living in government housing free of charge and maintaining that property at the benefit of the government is an important fact when we look at the case from respondent superior case. And if I may address respondent superior, because this court specifically has addressed this type of situation in Montana very, very recently with the LB v. United States decision. And I think that that case is very relevant when we consider the facts of Jackson. Of course, LB is a very different set of facts in which a tribal officer responded to reports of a DUI and ended up in a sexual assault situation with a woman who then sued the tribal officer. The district court in that case determined that respondent superior under Montana law did not apply because the act of sexual assault was not in the course and scope of activity that the employee was authorized to do. That court determined that decision on summary judgment. It came to the Ninth Circuit. The Ninth Circuit certified a question to the Montana Supreme Court asking whether specifically a tribal officer who has sexual activity while working for the government can hold the government responsible under respondent superior. And the Montana Supreme Court said yes, it can. And that's a factual determination. It came back to the Ninth Circuit. The Ninth Circuit sent it back down to the Montana District Court. District Court again decided in favor of the government. Plaintiff appealed. That case came back to the Ninth Circuit. The Ninth Circuit again decided that the judge, partially because that judge had decided the underlying criminal case, but sent it back down for a bench trial. LB was decided on February 25th of 2025. In that case, Judge Donald Molloy from the bench ruled that yes, the government was responsible under respondent superior after a one-day bench trial fact-finding to determine that he was within the course and scope. And so I think that a similar result should occur here. Rather than deciding the case on summary judgment, this case has specific facts which viewed in the light most favorable to Ms. Kaiser. Summary judgment should have not been denied. And as we learned from LB and also the Lutz case, the respondent superior question is much more nuanced and much more flexible and malleable than was decided here by the District Court. The act is whether . . . to determine whether the actor was in the course and scope of employment, the court has to decide whether the act was expressly or implicitly authorized here, whether having the dog was expressly or implicitly authorized, or, and the second factor I think is most important, consistent with LB and consistent with the facts here, whether it was incidental to an expressly or implicitly authorized act. Here, the tenancy by Jackson was incidental and explicitly authorized. And his decision to have a dog and the government's failure to remove that dog from the premises or to advise him of such, yields that the government could be held responsible for him under respondent superior. I have 30 seconds left. Do you want to save some time for rebuttal? We'll put two minutes on the clock when you come back. Thank you so much. I appreciate it. Thank you, Ms. Stone. May it please the Court. Good morning, Your Honors. My name is John Newman. I'm an assistant U.S. attorney with the District of Montana, and I represent the United States in this case. I agree, Judge Bress, with the two buckets you mentioned at the outset, the vicarious liability and premises liability buckets we have going on here. Does the Court have a preference on which one I address first? I would suggest the respondent superior. Okay, perfect. All right, well, before I get into the L.B. test, which my co-counsel discussed a moment ago, I want to read the description for Mr. Jackson's position as an irrigation systems maintenance worker with the Flathead Indian Irrigation Project. And the reason I want to do that is because I think it's helpful for marking the boundary between what's within and outside the scope of his employment. And that's important because we're talking about authorized acts under L.B. So the position description gives an idea of what constitute authorized acts with respect to his job. This description is at S.E.R. 5. So Mr. Jackson was expected to utilize knowledge and skill in carpentry, concrete, and masonry to repair and replace irrigation structures, including checks, drops, headgates. It goes on to describe the specifics of an irrigation system. Judge, I mean, there's really no question that the dog had nothing to do with his main job of running, working the irrigation systems. I guess the issue, though, is the circumstances by which he was living in the house and whether there was some part of his job that was actually about fixing the house and that the dog was then incidental to that. That seems to be what the whole case would turn on. I agree, Judge. The dog had absolutely nothing to do with his job. And as far as the circumstances that he came to be living in that house, so when he took the job in 2015, he asked to live in that house because he knew about it. He had lived there back in 2009. And the BIA said, the house is available. Sure, you can live in it. And it was Mr. Jackson that decided to fix it up because the house was completely uninhabitable at the time. But there was never a quid pro quo where the BIA said, you can live here if you repair the house or if you maintain it. Is that not at least genuinely disputed, though? Because, I mean, his testimony, my understanding was if I improved the home, I could stay there. So that's why I did a lot of work to it. Well, and so immediately prior to that part of the testimony, he talks about how the BIA owned a few other houses within the Flathead Reservation and that all of those houses were essentially falling to the ground. And so when he says, my understanding was I could live in it if I fix it, it wasn't that someone at the BIA said, you can live in it if you fix it. Somebody at the BIA said, you can live in it. And his understanding was, so long as it doesn't fall to the ground, I'm permitted to live in it. And that's not genuinely disputed. He never testifies that someone at the BIA said, so long as you fix it up, you can stay there. Well, that's a disputed fact, because he understood it one way, the government understands it a different way. Isn't that the very kind of thing that a prior fact would need to analyze? They may not believe Mr. Jackson, but it's at least a disputed fact, is it not? Well, I think even if you were to consider it a disputed fact, it's not a material fact because his... Sure, it goes to the very heart of this. Basically, if there's no connection, there's no authorization for him to be there as a trespasser. We got a whole different case. Well, but in order to determine the connection, we need to look at the acts that Mr. Jackson was authorized to perform pursuant to the job that he was hired to do, which is an irrigation systems maintenance worker. Well, I guess that's the issue here. I think you're assuming that's the scope of the job, but the scope of the job could be and somebody who lives on our property and fixes it. But there is no indication that the scope of his job as an irrigation systems maintenance worker expanded when he went to go live in that house. And so the analogy that I've thought of here is like if you lease a premises and part of the lease agreement, a term of the lease agreement is that you shovel the walkway, you don't become an employee of the landlord every time you shovel. Those two things are completely separate. That's a condition of your tenancy, whereas your job is something completely different. And you don't. I mean, that may be in your hypothetical. It's just that what he was doing here was seemingly a little different than just shoveling the snow. He's not paying rent at all. And he seems to be saying, I had the understanding that I could live there if I did this work on it. I guess the question I would have for you then is if that let's just assume for a second that that point is genuinely disputed. Where does the analysis go from there in terms of do you have a position as to why not? Because even if that's true, you would still win if it's if it's a genuine material dispute of fact as to the whether his work at that at the BIA included maintaining the house. Does this then need to go back or do you have other arguments as to why you should prevail? I think if it's genuinely disputed, whether the his living at the house was within the house to maintain it, if that's within the scope of employment, which I just obviously, you know, I don't agree with at all. And we know that. I think I think at that point, yeah, that that might be I think I'd have to concede that that might be a basis to send it back. But I don't think that by accepting, you know, that living arrangement, that became part of his employment. So he was he had to be a federal employee to live in this government furnished housing. But he didn't need to live in the government furnished housing to be a federal employee. So he wasn't judged as an employee by the way in which he maintained the house. And he could have lived there for free, lived there for free. And his contention, whether or not you agree with it, was that he could do that as long as he fixed it up. And he probably thought, well, you know, I'm not in a dangerous area. I need somebody to help protect me. I got a dog.  Well, that so that's that's his rental agreement. And it just so happens that his landlord is his employer. But just because he has even assuming that that was a term of of the rental agreement was that he would fix the place up sort of as a consideration for living there. That doesn't it's happenstance that it's his employer who is also his landlord. His job is a completely separate thing from that. And the position description that I just read indicates that. It doesn't it doesn't say that Mr. Jackson's job also involves repairing and maintaining other BIA structures. It's all about irrigation. So it's just essentially a coincidence that he lives in this house that's owned by his employer. And I think, you know, if you were to look at the position, the BIA didn't offer this house up to rent to any other federal employee. The only reason that Jackson I mentioned this a moment ago. The only reason that Jackson was living there was because he knew about it from a previous time working for the BIA. Is there anything in the record that indicates that when Mr. Jackson was in other structures that he had a bulldog or any kind of dog? I didn't see anything, but is there anything I can't recall? All I know, Your Honor, when he moved into this house in 2015, he didn't have any pets. He definitely didn't have this specific dog. I don't think he had any pets at all. He may have had, I honestly can't remember if he had pets in other circumstances. On the premises liability, your opposing counsel is pointing us to the policy, the BIA policy against pit bulls. And do you think that is sufficient to create a genuine dispute on the premises piece of this? No, Your Honor. So the general rule in Montana is, you know, that a lessor bears no responsibility for injuries caused by the acts of a tenant once possession is transferred. So there's no duty under Montana law for a lessor once possession is transferred. The only way that any sort of federal policy manual, federal statute, or that sort of thing would come into play and serve as evidence of the standard of care would be if there was an underlying state law duty. And that's the basis of the FTCA, basically. So an FTCA case can't be predicated on a duty that only arises under federal law. So because that, you know, that general rule regarding lessor liability is such that there is no duty, and that's under the Napton case under the restatement section 379A, because there's no duty, then we don't even get to the federal manuals or that sort of thing that might inform a standard of care if there was that underlying state law duty. But the duty would arise when? If the government knew or consented to him having the dog? That's precisely correct, yeah. And that's part of it. So if the, you know, the first prong, it's a two-pronged exception under section 379A. The first prong would be, and this is an exception to the general rule, the first prong would be if the lessor consented to the activity or knew that it was going to occur. So either says go ahead and do it or, like, has some information at the time the parties enter the rental agreement, has some information that this activity is going to go on. And then the second prong of the exception is that the lessor knows or has reason to know, so has actual knowledge that this activity and the standard, I think the phrasing is it presents an unreasonable or an unavoidable risk of unreason or it's unavoidably creates an unreasonable risk. That was the wording from the restatement second, 379A. So the, yeah, the lessor has to consent or know that something's going to happen, and the lessor has to know that this injury-causing activity will definitely cause an injury in essence. Your opposing counsel seems to be arguing that because the government has policies against pit bulls, they're knowledgeable that pit bulls can be dangerous, and therefore that would be sufficient. I take it you disagree with that. I do disagree with that. And for that, so, yeah, I mean, I think if you were to look at the Napton case, the Napton case provides a really good example of the type of information that constitutes knowledge under the had reason to know standard in the second part of that exception. So in Napton, the lessor knows that the tenant has two pit bulls, same type of breed of dog here, knows that the tenants have those pit bulls, but the Montana Supreme Court ultimately said that she didn't have reason to know under that second prong of the exception because she didn't know that the dogs were vicious. So this idea that, like, a generally applicable policy could translate to actual knowledge is undercut by Napton. It needs to be. I want to change the subject slightly. On the negligence per se, based on respondeat superior, apparently the Lake County Ordinance 861 provides that, in quotes, if a dog is determined to be a vicious dog by law enforcement, the owner of the dog may be ticketed for a misdemeanor offense. Now, it's a public ordinance. What role, if any, should that play in our analysis of the respondeat superior claim? So there were a number of sources of per se liability that the appellant raised in the district court, and some of them imposed strict liability, whereas some of them were related to controlling a dog and didn't oppose strict liability. So to the extent that that Lake County Ordinance imposes a strict liability on the owner of a vicious dog, the United States hasn't waived sovereign immunity for claims sounding in strict liability. But why would that impose strict liability when it just says it may be, you may be ticketed? And, Your Honor, I apologize. I know, like, as I said, there were a number of sources of per se liability. And so if it's not a strict liability provision that is the source of the per se liability, we go back to that vicarious liability question. So Jackson wasn't within the course and scope of his employment with respect to owning the dog, so his violation of any statute or ordinance that relates to controlling dogs doesn't transfer to the United States. I believe that may be all I have. If the court has any further questions, we'd ask that you affirm the district court. Okay. Thank you very much. Thank you. I appreciate it. Thank you. Briefly, Your Honors. Going back to the question about the per se liability, the question on the Lake County ordinance, it is plaintiff's position that that constitutes negligence per se, and that's set forth in the very end of our briefing, not strict liability, and that if the government is vicariously liable for Mr. Jackson, this would constitute negligence per se. So that's the purpose of the Lake County statute. Two quick points that I wanted to bring up. With respect to the prior tenancy, I think that this issue is important because there were some questions involving Jackson, whether just living at the property was enough. When Jackson lived at the property in 2009, he was required to pay rent. When he returned to the property, he was not. When he lived at the property in 2009, he had a lease agreement. When he returned to the property, he did not. But I think the fact that he changed or the government changed the terms and condition of his tenancy is important because when we look at the Lutz decision, which is, again, our military base, but in the Lutz decision, the animal that attacked the child was not a service animal, just like in this situation. We can agree that the dog was not used in Mr. Jackson's work as a ditch rider. So why does the existence or nonexistence of a lease bear on the question of whether he's a lessee and they're a lessor? Well, I think that it bears on the position that the government failed to follow its own policies with respect to its requirements of tenants in government housing. Mr. Jackson testified that he had under the prior lease and then also when he worked for the BIA, I believe it was in Nevada or Arizona, that he was subject to a lease, annual inspections, and that had he known that there was policies in place that prohibited pit bulls, he would not have acquired this dog. And that is testimony of record in the depositions. Any further questions? Great. Thank you very much. We thank both counsel for the briefing and argument. This case is submitted.
judges: THOMAS, SMITH, BRESS